UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No.   4:19 CR 488 SRC/JMB |
| | ) | |
| LISA HURLEY, | ) | |
| | ) | |
| Defendant. | ) | |

**RESPONSE TO MOTION TO SUPPRESS EVIDENCE**

COMES NOW the United States of America, by and through Jeffrey B. Jensen, the United States Attorney for the Eastern District of Missouri and Thomas J. Mehan, Assistant United States Attorney for said district, and files this response to the Motion to Suppress Evidence.

## I.    INTRODUCTION

As to Count One, Hurley seeks to suppress two firearms arguing that: 1) the arresting officers must have acted with an objectively reasonable reliance on the information in the "wanted;" and 2) that the officer who issued the "wanted" must have had reasonable suspicion and probable cause that Hurley committed a crime.   The argument fails as the arresting officer had knowledge of basis of the "wanted" and the detective who issued the "wanted" did so having reasonable suspicion and probable cause that she committed a crime and the arresting officers relied on that information to detain her.   Further, shortly after being detained on the "wanted", the officers observed the commission of a completely separate crime, the possession by a felon of a firearm.

1

As to Count Two, Hurley seeks the suppression of evidence seized arguing that the protective sweep of the residence when she was arrested on a warrant, exceeded the scope of the arrest warrant.   This argument fails as the officer conducting a valid protective sweep saw in plain view evidence of an immediate incriminating nature.

II.    **FACTS**

A.  **The Homicide Investigation and Basis for the Wanted**

On January 15, 2019, members of the Homicide Unit of the St. Louis Metropolitan Police began an investigation into the shooting death of NP, which occurred near the intersection of Carter and Marcus Avenues.    That day police interviewed the two witnesses, ES and AB, who drove NP to the hospital after the shooting.    They said that received a call that NP had been shot and drove to his location, near the intersection of Carter and Shreve.   On the way to NP's location, they passed Hurley's place of business and saw a man with a long rifle and a female in front. The female was screaming.    During the drive to the hospital, NP told both, ES and AB that the "bitch at the store shot me".

During the subsequent investigation, SM was interviewed and told police that the day of the murder of NP, she was getting groceries out of her car, which was parked between Hurley's place of business and the location where NP was eventually picked-up by ES and AB.    She noticed a man running past, limping and holding his side.    She thought it was NP.    She then looked in the direction NP came from and recognized Hurley standing in front of her business, at Marcus and Carter, waiving a firearm in the air screaming "that is what the f*ck he gets".    She thought Hurley, while in a rage, was chasing NP.    SM identified Hurley from a photo spread as

the owner of the business and the individual she saw standing in front waiving the firearm and screaming.

Based upon that information, on April 24, 2019, the Homicide Detective entered Hurley as "wanted" for murder and armed criminal action.   As is typical of the interaction of these units, he enlisted officers assigned to the Intelligence Unit in locating violent defendants wanted for murder. In order to assist them in apprehending the Defendant, member of the Intelligence Unit were briefed on the investigation, albeit her identification by the witness waiving the firearm in the air. Their investigation began immediately.

**B.  The arrest on May 8, 2019, Seizure of Firearms and Statements**

On May 8, 2019, the Intelligence Unit conducted surveillance and saw Hurley exit her residence and enter her car while carrying a red and white book bag.   They followed her to her place of business at the corner of Marcus and Carter.   She entered, carrying the red and white book bag.   When the officers entered, Hurley was standing near the checkout counter, she was detained on the murder wanted, a warrantless arrest.   There were at least two others in the business.   Due to the nature of the wanted and that, Hurley was seen waiving a firearm in the air and the presence of others in the business; one officer conducted a protective sweep for the officers' protection.   He found no other people and seized nothing.   He saw a red and white bag but ignored it.   He returned to the front of the store where Hurley was in custody and she told the officers that she had recently been in an accident and needed her medication, which she said was in her bag.[1]   Hearing her request, the officer who conducted the protective sweep said that he had

---

1  Hurley was wearing a neck brace.

seen the red and white bag.    One would not expect the police to ignore even a suspect's need of medicine.    Public policy and interests would expect law enforcement to assist in obtaining her medicine as they could see her wearing a neck brace.    He then went to retrieve her medicine from her bag at her request. That is when he saw the two firearms sticking out of the bag and seized them knowing she was a convicted felon.    Within minutes of Hurley's detention on the "wanted", the police told her that she was under arrest for the possession of the firearms as a convicted felon committed in their presence.

After being advised of her Miranda rights, Hurley admitted at the scene and in a subsequent police interview with the Homicide Unit at the station to the possession of those firearms.

### C.  The arrest on June 25, 2019, Protective Sweep and Seizure of a Firearm

On June 25, 2019, at 6:50 in the morning, some of the same members of the same Unit were in possession of an arrest warrant issued for the possession of the firearms Hurley possessed in May.    The officers knew that Hurley was a suspect in a fatal shooting, in which she was standing with another male with a firearm, waiving her firearm in the air on a public street.    They also knew that within the past month she possessed two firearms at her place of business that she had in her bag when she left her residence, the location of this protective sweep.

The officers responded to her residence and knocked on the door.    Hurley answered the door wearing pajamas. She was taken into custody at the front door. Knowing she was going to be booked again, she asked for clothing.    Officers, wanting to obtain clothing for Hurley, and otherwise secure the residence upon her arrest, and to ensure their own safety, conducted a cursory protective search of the residence.    Again, for officer safety and prior to letting her get clothing

or obtaining clothing for her, a protective sweep was conducted to make there were no other suspects who could harm them, children present or any other person in need that may have to be dealt with and to turn the house over to someone.   During the sweep, the officers saw suspected narcotics and a 12-gauge shotgun, which they seized.   The officers retrieved clothing for her at her request and ergo would have inevitably seen the items seized.

### III.   ARGUMENT

**A. The Wanted Was Supported by Probable Cause and the Officers Developed Additional Independent Probable Cause on May 8, When Defendant Was in Possession of Firearms.**

#### 1.   The Wanted Was Supported by Probable Cause

The presence of the officers at Hurley's place of business was lawful and her brief detention based on that "wanted" was based upon probable cause.   Investigators had probable cause to believe Hurley committed a murder.   Objectively speaking, investigators also probable cause to arrest Hurley for exhibiting a firearm in an angry or threatening manner for the events that occurred in front of her store as detailed above.   The observation of the ongoing commission of a crime on May 8, 2019, felon in possession of firearms, supported continued detention and her subsequent arrest for that crime.

"The Fourth Amendment protects individuals against unreasonable searches and seizures by the government." *United States v. Williams*, 521 F.3d 902, 905 (8th Cir. 2008) (citing *Minnesota v. Carter,* 525 U.S. 83, 88 (1998)). It is well established, however, that a warrantless arrest of an individual in a public place upon probable cause does not violate the Fourth Amendment. *United States v. Watson,* 423 U.S. 411, 423-24, 96 S. Ct. 820 (1976). The United States Supreme Court

has recognized that to require a "magistrate's review of the factual justification prior to any arrest . . . would constitute an intolerable handicap for legitimate law enforcement." *Gerstein v. Pugh*, 420 U.S. 103, 113, 95 S. Ct. 854, 862 (1975) (noting that the Court "has never invalidated an arrest supported by probable cause solely because the officers failed to secure a warrant."). Indeed, law enforcement officers make probable cause determinations without the aid of a magistrate judge on a daily basis.

It is equally settled that an officer may affect an arrest or conduct a *Terry* stop based on information received from another officer. The appropriateness of an arrest made on the basis of information received through police channels was first addressed by the Supreme Court in *Whiteley v. Warden*, 401 U.S. 560, 91 S. Ct. 1031, 28 L.Ed.2d 306 (1971). In *Whiteley*, a Wyoming county sheriff obtained an arrest warrant for a person suspected of a burglary and issued a message through a law enforcement radio network describing only the suspect, his car, and the property taken. *Id.* at 563. Having heard the broadcast, an officer in another jurisdiction stopped the suspect and searched his car. *Id.* The Supreme Court ultimately concluded that the sheriff who obtained the warrant lacked probable cause and, thus, the evidence seized during the search by the arresting officer should be suppressed. *Id.* at 568. More importantly, however, the Supreme Court's decision in *Whiteley* made clear that an arresting officer may rely on a police communication when effecting an arrest, so long as the communication possessed probable cause, even though the arresting officer was unaware of the specific facts that established probable cause.    *Id.* at 568.

Thereafter, in *United States v. Hensley,* 469 U.S. 221, 105 S. Ct. 675 (1985), the Supreme Court extended the holding in *Whiteley* to situations in which an officer effects a *Terry* stop, rather

6

than an arrest, on the basis of information received from another police officer or department. In *Hensley*, a police officer conducted a traffic stop of the defendant's vehicle pursuant to a flyer, issued by another police department, stating that Hensley was wanted for investigation of an aggravated robbery. *Id.* at 223. The wanted flyer was based on information from an informant that Hensley was the getaway driver during an armed robbery in St. Bernard, Ohio. *Id.* While the officer in a nearby jurisdiction in Kentucky who conducted the traffic stop was unaware of the circumstances surrounding the robbery, he was made aware by his fellow officers of the existence of the wanted that had been received via teletype. *Id.*

Hensley moved to suppress handguns subsequently seized from his vehicle arguing that the Kentucky police officer stopped him in violation of the Fourth Amendment. *Id.* at 226. Specifically, Hensley argued that the stop was unconstitutional because (1) the crime being investigated was not imminent or ongoing, but rather was already completed; and (2) the "wanted flyer" was insufficient to create a reasonable suspicion that he had engaged in criminal    activity. *Id.*

Rejecting both of Hensley's arguments, the Supreme Court first held: [W]here police have been unable to locate a person suspected of involvement in a past crime, the ability to briefly stop that person, ask questions, or check identification *in the absence of probable cause* promotes the strong government interest in solving crimes and bringing offenders to justice. Restraining police action until after probable cause is obtained would not only hinder the investigation, but might also enable the suspect to flee in the interim and to remain at large. Particularly in the context of felonies or crimes involving a threat to public safety, it is in the public interest that the crime be

solved and the suspect detained as promptly as possible. The law enforcement interests at stake in these circumstances outweigh the individual's interest to be free of a stop and detention *that is no more extensive than permissible* in the investigation of imminent or ongoing crimes. *Id.* at 229 (emphasis added). In other words, the "justification for a stop did not evaporate when the armed robbery was completed." *Id.* at 234.

The Supreme Court next addressed the officer's reliance on the bulletin to conduct the *Terry* stop, holding that "if a flyer or bulletin has been issued on the basis of articulable facts supporting a reasonable suspicion that the wanted person has committed an offense, then reliance on that flyer or bulletin justifies a stop to check identification, to pose questions to the person, or to detain the person briefly while attempting to obtain further information. *Id.* at 232 (internal citations omitted). As a result, the Supreme Court instructed that "[i]t is the objective reading of the flyer or bulletin that determines whether other police officers can defensibly act in reliance on it." *Id.* at 233.

As the Supreme Court in *Hensley* acknowledged, the *Whiteley* decision supports the proposition that had the officer who issued the radio bulletin possessed probable cause for arrest, then the arresting officer "could have properly arrested the defendant even though they were unaware of the specific facts that established probable cause." *Hensley*, 105 S.Ct. 230-31 (citing *United States v. Maryland,* 479 F.2d 566, 569 (5th Cir. 1973)).

In other words, at no point did the Supreme Court differentiate between an arrest and a *Terry* stop, other than with respect to the level of suspicion required. The law enforcement officer's actions simply must not be "more extensive than permissible." *Hensley,* 469 U.S. at 229 (emphasis

8

added).

Not surprisingly, other circuit courts of appeal have extended the holdings in *Whiteley* and *Hensley* to situations involving the arrest or search by one officer based on another officer's probable cause. For example, in *United States v. Celio*, 945 F.2d 180 (7th Cir. 1991), the Illinois State Police ("ISP") pulled over and arrested the defendant and searched his vehicle at the request of the Drug Enforcement Administration ("DEA"). At the time of the arrest, the DEA had communicated to the ISP only that the agents suspected drug-trafficking, but none of the facts forming the basis for that conclusion.    *Id.* at 183.

Affirming the district court's denial of the defendant's motion to suppress, the Seventh Circuit reasoned that the case paralleled *Hensley* in two respects: "[t]he police action was based entirely on a request from a different jurisdiction that the subject be apprehended, and the representation involved only a generalized statement without the factual details in which the suspicion was rooted." *Id.* Recognizing the "importance of coordinated law enforcement activities," the court upheld the search after finding that the DEA had probable cause to support the ISP's arrest and search, even though the details supporting the probable cause finding had not been communicated to the ISP.    *Id.* 183-84; *see also United States v. Rodriguez-Rodriguez,*   550 F.3d 1223 (10th Cir. 2008) (holding that "[i]n the ordinary case involving reliance on an alert issued by an officer with firsthand knowledge, the court analyzes whether the issuing officer had reasonable suspicion to support a stop or probable cause to support an arrest").

The Missouri state courts also have upheld arrests based on a wanted bulletin. In *United States v. Pate,* 469 S.W.3d 904 (E.D. Mo. 2015), a detective with the University City, Missouri,

9

police department put out a "wanted" for the defendant after he was identified as one of two individuals who had committed an armed robbery. Almost four months later, the defendant was arrested by police officers in Cuba, Missouri, and transported back to University City. *Id.* at 907. The following day, the officer who put out the wanted interviewed the defendant. *Id.* at 907. Despite the defendant admitting nothing, the detective then sought a warrant for the defendant's arrest and charges followed.     *Id.*

Similar to Hurley, the defendant in *Pate* argued that the trial court should have suppressed his statements because his warrantless arrest in Cuba, Missouri, violated his Fourth Amendment rights in that it was based only upon a "wanted," rather than a warrant for his arrest. *Id.* at 910. Rejecting the defendant's argument, the court first acknowledged that the "wanted" was "a way to inform other police officers that [d]efendant was involved in a robbery, and it gave other police officers authority to arrest [d]efendant if they encountered him." *Id.* at 910. The court then held that the necessary inquiry is not "whether there was a warrant or whether there was time to get one, but whether there was probable cause for the arrest." *Id.* (quoting *United States v. Watson*, 423 U.S. 411, 417, 96 S.Ct. 820 (1976)).   In performing that analysis, the court explained:

The information supporting probable cause must be known to the officers before the arrest. It may be made up of the collective knowledge and the facts available to all of the officers participating in the arrest; the arresting officer does not need to possess all of the available information.

Moreover, information supplied by one police department can provide the probable cause for an officer in another police department to make an arrest. Radio bulletins, telephone calls, computer records, and police flyers have all been upheld as permissible means of authorizing

10

officers to arrest, so long as the individual officer disseminating the information had probable cause to arrest at that time.

In such a case, the State must show that the officer who provided the information had probable cause that would have enabled the officer to make the arrest himself. If it is later apparent that the officer requesting assistance in arresting the accused did not have probable cause for the arrest, evidence obtained incident to the arrest may be suppressed. *Id.* at 910-11 (internal citations and quotation marks omitted). The court then concluded that because the University City detective had sufficient evidence that probable cause existed for the defendant's arrest, the defendant's arrest in Cuba, Missouri, based solely on the wanted bulletin, was lawful.   *Id.* at 912.

While this Court is not bound by the opinions of the Missouri Court of Appeals, it certainly can look to state court decisions for insight. *See, e.g., United States v. Blakeney,* No. 16-3945, 2017 WL 6273827 at * 2 n. 3 (8th Cir. Dec. 11, 2017) (citing *Pate* for the proposition that "a 'wanted' provides authority for an arrest but differs from an arrest warrant because it is not a statement of probable cause signed by a judge").

The warrantless arrest for the murder charge was based upon probable cause as previously discussed in Section II and will be restated here.

On January 15, 2019, members of the Homicide Unit of the St. Louis Metropolitan Police began an investigation into the shooting death of NP, which occurred near the intersection of Carter and Marcus Avenues.   That day police interviewed the two witnesses, ES and AB, who drove NP to the hospital after the shooting.   They said that received a call that NP had been shot and drove to

his location, near the intersection of Carter and Shreve.   On the way to locate NP, they passed Hurley's place of business and saw a man with a long rifle and a female in front. The female was screaming.   During the drive to the hospital, NP told both, ES and AB that the "bitch at the store shot me".

During the subsequent investigation, SM was interviewed and told police that the day of the murder of NP, she was getting groceries out of her car, which was parked between Hurley's place of business and the location where NP was eventually picked-up by ES and AB.   She noticed a man running past, limping and holding his side.   She thought it was NP.   She then looked in the direction NP came from and recognized Hurley standing in front of her business, at Marcus and Carter, waving a firearm in the air screaming "that is what the f*ck he gets". She thought Hurley, while in a rage, was chasing NP.   SM identified Hurley from a photo spread as the owner of the business and the individual she saw standing in front waiving the firearm and screaming.

Based upon that information, on April 24, 2019, the Homicide Detective entered Hurley as "wanted" for murder and armed criminal action.   As is typical of the interaction of these units, he enlisted officers assigned to the Intelligence Unit in locating violent defendants wanted for murder.   In order to assist them in apprehending the Defendant, member of the Intelligence Unit were briefed on the investigation, albeit her identification by the witness waiving the firearm in the air.   Their investigation began immediately.

12

The manner in which probable cause is determined is the same in both probable cause for arrest and probable cause for a search warrant. The quantum of evidence needed to meet this probable cause standard has been addressed by the Supreme Court on numerous occasions:

> In dealing with probable cause, as the very name implies, we deal with probabilities. These are not technical; they are factual and practical considerations of everyday life upon which reasonable and prudent men, not legal technicians, act. *Brinegar v. United States*, 338 U.S. 160, 176 (1949).

Probable cause is a "fluid concept turning on the assessment of probabilities in a particular factual context–not readily or even usefully reduced to a neat set of legal rules. *See Illinois v. Gates*, 462 U.S. 213, 232 (1983). Further, probable cause in an affidavit "must be weighed not in terms of library analysis by scholars, but as understood by those versed in the field of law enforcement." *Illinois v. Gates*, *supra*, at 232. Probable cause may be based on the totality of the circumstances present. All that need be shown for probable cause to arrest is that a "fair probability" exists that a crime has been committed and that the defendant committed the crime. *See Illinois v. Gates*, *supra*, at 238; *United States v. Allen*, 297 F.3d 790, 794 (8th Cir. 2002); *United States v. Gabrio*, 295 F.3d 880, 882, 883 (8th Cir. 2002).

The facts set forth above, including N.P.'s statement to the effect that "the bitch at the store shot me," and the witness statement identifying Hurley as being outside the store after N.P. was shot, in a rage, waving a pistol and stating words to the effect that "that is what the f*ck he gets," overwhelmingly establishes probable cause based upon "factual and practical considerations of everyday life upon which reasonable and prudent men, not legal technicians, act." The homicide investigation established probable cause to believe Hurley committed the murder of N.P. The homicide unit immediately enlisted the Intelligence Unit to assist in the apprehension of Hurley

based upon this well-established probable cause.

Moreover, in addition to establishing probable cause to arrest defendant for murder, the facts viewed *objectively* also establish probable cause to arrest for unlawful use of a weapon, exhibiting, under Missouri law.   Missouri Revised Statute § 571.030.1(4) states that, "A person commits the offense of unlawful use of a weapon …. If he or she knowingly: (4) Exhibits, in the presence of one or more persons, any weapon readily capable of lethal use in an angry or threatening manner."   This offense is a class E felony pursuant to 571.030.8(1).   That the Homicide Detective only issued a wanted for murder first degree and armed criminal action does not mitigate the existing probable cause that also existed in relation to exhibiting a firearm in an angry or threatening manner.   The Supreme Court has "never held….that an officer's motive invalidates objectively justifiable behavior under the Fourth Amendment…we have repeatedly held and asserted the contrary."   *Whren v. U.S.*, 517 U.S. 806, 812 (1996).   Conversely, the Supreme Court has expressly stated that:

> S**ubjective intent alone…does not make otherwise lawful conduct illegal or unconstitutional….** [T]he fact that the officer does not have the state of mind which is hypothecated by the reasons which provide the legal justification for the officer's action does not invalidate the action taken as long as the circumstances, *viewed objectively*, justify that action.   *Id.* at 813 (emphasis added) (citations omitted).

As described above, in addition to having probable cause to believe that defendant committed murder, there was also probable cause to believe defendant exhibited a firearm in an angry or threatening manner as the investigation established as much when she displayed the firearm in front of the store on January 15, 2019.

14

**2.   The Seizure of the Firearms On May 8 Was Reasonable Under the Plain View Doctrine.**

As to the particular seizure of the firearms on May 8, the plain view doctrine permits law enforcement officers to seize without a warrant when (1) The officer did not violate the Fourth Amendment in arriving at the place from which the evidence could be plainly viewed, (2) the object's incriminating character is immediately apparent, and (3) the officer had a lawful right of access to the object itself.   *United States v. Weinbender*, 109 F. 3d 1327, 1330 (8th Cir. 1997.

There was no Fourth Amendment violation as the officers lawfully arrived at her place of business, they had a lawful access to the object when Hurley asked the officers to get her medicine from her bag, and their observation of a convicted felon with firearms in her purse was immediately apparent.

*Weinbender* has been satisfied.   The seizure of the firearms is reasonable under the plain view doctrine.   Consistent with cases in which an arrested person requests clothing, *infra*, the officers acted reasonably when they responded to Hurley's request to obtain her medication, which put them in a position to observe the firearms that were visible in her purse.   To the extent officers conducted a protective sweep, they were justified in doing so pursuant to the facts set forth above, and the authority set forth below.

Additionally, whether or not a protective sweep was conducted, the firearms would have been inevitably discovered because Hurley asked the officers for her medication and directed them to its location which led the officers to the firearms.   Public police and good police practice would commend the police to provide medicine a suspect asks for especially when they observed Hurley

15

wearing a neck brace. 2   Under the inevitable discovery doctrine, "if the prosecution can establish by a preponderance of the evidence that the information, otherwise to be suppressed under the exclusionary rule, ultimately or inevitably would have been discovered by lawful means, then the exclusionary rule does not apply." *United States v. James*, 353 F.3d 606, 616–17 (8th Cir. 2003) (citing *Nix v. Williams*, 467 U.S. 431, 444 (1984).

**B.  The Firearm and Evidence Seized on June 25, Are Admissible Because as the Police Were Conducting a Reasonable Protective Sweep and Hurley Asked for Clothing to Wear Which Would Have Led to the Inevitable Discovery of the Firearm.**

"The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated…." U.S. CONST. AMEND. IV. "[S]earches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment–subject only to a few specifically established and well delineated exceptions." *Katz v. United States*, 389 U.S. 347, 357 (1967).

Initial entry into Hurley's Residence is governed by the arrest warrant exception to the search warrant requirement.   "[F]or Fourth Amendment purposes, an arrest warrant founded on probable cause implicitly carries with it the limited authority to enter a dwelling in which the suspect lives when there is reason to believe the suspect is within."   *United States v. Glover*, 746 F.3d 369, 373 (8th Cir. 2014) (citing *Payton v. New York*, 445 U.S. 573, 603 (1980)).

The Fourth Amendment permits protective sweeps of areas beyond the space "immediately

---

2 The Government has not been able to find a case addressing a medicine exception analogous to the "clothing exemption discussed in Section III B later but refers this court the reasoning therein.

adjoining the place of arrest" when there exist "articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene." *Maryland v. Buie*, 494 U.S. 325, 334, 110 S.Ct. 1093, 108 L.Ed.2d 276 (1990); see *United States v. Davis*, 471 F.3d 938, 944 (8th Cir. 2006) ("A protective sweep may be executed after an arrest if there is a reasonable possibility that other persons may be present on the premises who pose a danger to the officers."). There is no Fourth Amendment violation when a protective sweep of the home is supported by a reasonable suspicion that other persons may have been hiding therein.

The officers knew that Hurley was a suspect in a fatal shooting, in which she was standing with another male with a firearm, waving her firearm in the air on a public street and that she was being arrested for possessing two firearms from the previous month from her bag, which she carried from the same residence that she was now being arrested in.

The officers' brief, reasonably based protective sweep thus did not violate Hurley's Fourth Amendment rights. *See Davis*, 471 F.3d at 945 (upholding protective sweep because the officers' knowledge of defendant's prior firearms possession, is a factor that can indicate a "heightened possibility of a surprise attack"); *United States v. Waters*, 883 F.3d 1022, 1025-26 (8th Cir. 2018) (per curiam) (upholding protective sweep notwithstanding the defendant's fiancée's statement to investigating officers that the defendant was the only person inside the residence).

That Hurley was arrested at or near her door does not invalidate the reasons for the sweep. Even with officers outside the home, they still faced potential danger from someone *within* the residence. Specifically in *United States v. Alatorre*, 863 F.3d 810, 812 (8th Cir. 2017), the Eighth

17

Circuit upheld a protective sweep just like the one at Hurley's Residence.  In *Alatorre*, the defendant was arrested after coming to the front door.  *Id.* at 812.  He was handcuffed and then moved to the front porch prior to the protective sweep.  *Id.*  The Eighth Circuit held that the protective sweep was permissible, recognizing that many circuits have upheld protective sweeps of buildings when an arrest occurs outside the building.  *Id.* at 814 (citing, e.g., *United State v. Cavely*, 318 F.3d 987 (10th Cir. 2003) (arrest outside rear door of residence); *United States v. Hoyos*, 892 F.2d 1387 (9th Cir. 1989) (overruled on other grounds by *United States v. Ruiz*, 257 F.3d 1030, 1032 (9th Cir. 2001) (en banc)); *United States v. Davis*, 471 F.3d 938 (8th Cir. 2006) (arrest outside a barn)).  Like in these cases, the officers' presence on the front porch did not insulate them from the potential danger from inside the residence. As the *Alatorre* Court recognized, the "[p]rotection of officers conducting an arrest near a defendant's home is a priority recognized by our courts."  *Id.*

"Ordinarily, the arrest of a person outside of a residence does not justify a warrantless search of the residence itself." *United States v. DeBuse*, 289 F.3d 1072, 1074 (8th Cir. 2002). An exception to this rule, however, allows law enforcement to enter the residence to retrieve clothing for an arrestee. *Id*. (citing *United States v. Gwinn*, 219 F.3d 326, 333 (4th Cir. 2000)).     Courts that have applied the "clothing exception" have done so using the exigent circumstances exception to the warrant requirement. *See*, *e.g.*, *United States v. Reid*, 769 F.3d 990, 992-93 (8th Cir. 2014); *DeBuse*, 289 F.3d at 1074; *United States v. Wilson*, 306 F.3d 231, 241 (5th Cir. 2002) (overruled on other grounds) (recognizing a duty to obtain clothing when the defendant was arrested wearing only boxer shorts); *Gwinn*, 219 F.3d at 333 (holding "an officer is authorized to

18

take reasonable steps to address the safety of the arrestee and that the arrestee's partially clothed status may constitute an exigency justifying the officer's temporary reentry into the arrestee's home to retrieve clothes reasonably calculated to lessen the risk of injury to the defendant"); *United States v. Butler*,   980 F.2d 619, 621 (10th Cir. 1992); *United States v. DiStefano*, 555 F.2d 1094, 1101 (2d Cir. 1977) ("The officers had a duty to find clothing for [the defendant] to wear or to permit her to do so.").

There are a number of circuit court opinions which address the question of providing an arrestee with clothing before being transported, and the admissibility of evidence found while retrieving the arrestee's clothes. The Second Circuit, in *United States v. Di Stefano*, found that "[t]he officers had a duty to find clothing for Sally [defendant] to wear or to permit her to do so." 555 F.2d 1094, 1101 (2nd Cir. 1977). The *DiStefano* court went on to hold that the seizure of evidence found in the defendant's closet was lawful, as it was in plain sight once the defendant had opened the closet door in order to dress herself. *Id.* The Tenth Circuit reached a similar result in *United States v. Butler*, finding that guns seized from defendant's residence were lawfully admitted into evidence, as the officers acted out of concern for the defendant in taking him into the residence to obtain shoes. 980 F.2d 619, 622 (10th Cir. 1992). The Fourth Circuit also upheld the seizure of a firearm, located by officer's who had entered the arrestee's house to obtain boots and a shirt for the arrestee. In *United States v. Gwinn*, 219 F.3d 326, 333 (4th Cir. 2000), the court specifically stated that "an officer is authorized to take reasonable steps to address the safety of the arrestee and that the arrestee's partially clothed status may constitute an exigency justifying the officer's temporary reentry into the arrestee's home to retrieve clothes reasonably calculated

to lessen the risk of injury to the defendant." *Id.* The Fifth Circuit provided a thorough analysis of the issue, and held that "the potential of a personal safety hazard to the

arrestee places a duty on law enforcement officers to obtain appropriate clothing." *United States v. Wilson*, 306 F.3d 231, 241 (5th Cir. 2002); *see also United States v. Clay*, 408 F.3d 214, 218 (5th Cir. 2005) (reaching same result in case of a parolee).

An officer may enter an arrestee's residence, or a specific room of that residence, in order to locate clothing for an arrestee, where such clothing is required for the defendant's health or safety.   The team leader of the arrest team was an experienced entry team member and it is understandable that he would not allow a team member to retrieve clothing bedroom until the residence had been cleared and they knew it was safe.

An officer may, however, accompany an arrestee into her residence to obtain clothing or identification. "Even absent an affirmative indication that the arrestee might have a weapon available or might attempt to escape, the arresting officer has authority to maintain custody over the arrestee and to remain literally at [the arrestee's] elbow at all times." Id. (citation omitted); *accord Washington v. Chrisman*, 455 U.S. 1, 6—7 (1982) ("[I]t is not unreasonable under the Fourth Amendment for a police officer, as a matter of routine, to monitor the movements of an arrested person, as his judgment dictates, following the arrest.") .

When the officers arrested Hurley at her residence, it was not a surprise that she was wearing pajamas as the arrest occurred at 6:50 am. She knew she was going to be booked on the warrant and asked for clothes.   The officers were either going to get her clothes or accompany her into her residence to change into clothes.    If they were going to escort her into the residence,

they would be entitled to enter the residence immediately before or with Hurley.   The purpose of the escort would be to ensure that there were no other individuals or weapons in the bedroom when she changed clothes. *Debuse*, 289 F.3d at 1074—75 (holding that where the defendant "chose to reenter his house simply for his own convenience [a]llowing reentry on the condition that the officers accompany him was reasonable").

For the foregoing reasons, the protective sweep and seizure of evidence in plain view was reasonable and supported by the clothing exception.

## IV.    CONCLUSION

For the reasons stated herein, the motion to suppress should be denied.

Respectfully submitted,

JEFFREY B. JENSEN
United States Attorney

/s/ Thomas J. Mehan
THOMAS J. MEHAN, #28958MO
Assistant United States Attorney

## CERTIFICATE OF SERVICE

The above signed hereby certifies that a copy of the above was served via this Court's electronic filing system upon counsel of record on September 11, 2020.

/s/ Thomas J. Mehan
THOMAS J. MEHAN, #28958MO
Assistant United States Attorney

21