UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No.  4:19 CR 488 SRC (JMB) |
| | ) | |
| LISA HURLEY, | ) | |
| | ) | |
| Defendant. | ) | |

**REPORT AND RECOMMENDATION
OF UNITED STATES MAGISTRATE JUDGE**

Currently before the Court is Defendant Lisa Hurley's Motion to Suppress Evidence. (ECF No. 46)  The government opposes Hurley's motion.  Pretrial motions were referred to the undersigned United States Magistrate Judge.  See 28 U.S.C. § 636(b).

**PROCECURAL BACKGROUND**

On June 27, 2019, the Grand Jury charged Hurley with two counts of being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g).  Count One resulted from evidence seized during Hurley's arrest on May 8, 2019, relative to a felony "Wanted" issued by the St. Louis Metropolitan Police Department ("SLMPD").  Count Two resulted from evidence seized during Hurley's arrest by the SLMPD, on June 25, 2019, relative to a felony warrant.

Hurley's motion asks the Court to suppress the evidence (firearms) seized during each of her arrests.  The Court held three evidentiary hearings on Hurley's motion.  Hurley was present with counsel for each hearing.  On September 22, 2020, the government presented the testimony

of SLMPD Detectives Joshua Wenstrom and James Wilcox.[1]  Due the unavailability of a third

witness, the Court held the record open until October 7, 2020, at which time the government

presented the testimony of Deputy U.S. Marshal Nijauh Woodard.[2]  Dep. Woodard was

previously an officer with the SLMPD and testified based on his duties as an SLMPD officer; he

is referred to herein as Detective Woodard.  On the Court's own motion, the evidentiary hearing

was reopened on February 2, 2021, to receive additional testimony and evidence regarding

Hurley's arrest on May 8, 2019.  With the consent of Hurley, her attorney, and the attorney for

the government, the February 2nd evidentiary hearing was conducted via Zoom videoconference.

At the February 2nd hearing, the government presented additional testimony from Det. Wilcox.[3]

Based on the testimony and evidence from the evidentiary hearings, having had the

opportunity to observe the demeanor and evaluate the credibility of the witnesses, having

carefully reviewed the exhibits, and having fully considered the parties' arguments and written

submissions, the undersigned makes the following findings of fact, conclusions of law, and

recommendations.

## FINDINGS OF FACT

Joshua Wenstrom is a homicide Detective with the SLMPD.  As of the September 2020

evidentiary hearing, Det. Wenstrom had about ten years of law enforcement experience.  On or

about January 19, 2019, Det. Wenstrom was assigned to investigate a homicide involving a man

(N.P.) who died after being dropped off at Barnes-Jewish Hospital with gunshot wounds.  No

officer was able to interview N.P. before he died, but Det. Wenstrom interviewed the two women

---

[1] See ECF No. 62, Clerk's Witness List for 09/22/2020; ECF No. 61, Clerk's Exhibit List for 9/22/2020.

[2] See ECF No. 65 Clerk's Witness List for 10/07/2020; ECF No. 66, Clerk's Exhibit List for 10/7/2020.

[3] See ECF No. 85 Clerk's Witness List for 02/05/2021; ECF No. 86, Clerk's Exhibit List for 2/5/2021.

who dropped off N.P. at the hospital.  These two women are referred to herein as E.S. and A.B.

Det. Wenstrom testified that E.S. and A.B. reported that they received a call that N.P. had been

shot and needed to be taken to the hospital.  They advised that N.P. told them that the "bitch at

the store" shot him.  Det. Wenstrom identified on a map (Gov't Exh. J) the location where the

two women reported that they picked up N.P., which was in the general vicinity of a store owned

and operated by Hurley.

Detective Wenstrom testified that, based on his recollection of hospital surveillance

video, N.P. was shoved out or stepped out of the car and collapsed.  The car that brought N.P. to

the hospital then drove off.  A second vehicle arrived thereafter with a woman who indicated her

boyfriend may have been shot. This woman also reported to the police that N.P. was last with

"Monk."  Monk is an alias or nickname of Telvon Boyd.[4]

A public safety officer at Barnes-Jewish Hospital named Boul reported that N.P. stated

"they" shot him, without reference to a particular person.

Detective Wenstrom testified that witness E.S. was not completely forthcoming and

changed her story.  He described witness A.B. as forthcoming but that she would not contact him

or come to his office because she believed she had warrants.  According to Det. Wenstrom, E.S.

initially stated that she was the driver of the vehicle that dropped of N.P. at the hospital.  That

statement was refuted by video.  When confronted, E.S. stated she was worried that A.B. would

get in trouble because A.B. was on probation.

Detective Wenstrom also issued a Wanted for Telvon Boyd and interviewed him on

February 6, 2019.  During that interview, Boyd reportedly volunteered that he was aware people

---

[4] During cross-examination, Hurley attempted to elicit testimony that E.S., A.B., and Boyd are siblings. Det. Wenstrom, however, was not sure of their actual family relationship and suspected that they were not all related. See Tr. Vol. I at 25, 32.  No evidence was presented as to the actual, legal relationship between E.S., A.B., and Boyd.

had said he killed N.P. and that he had provided drugs to N.P.  Det. Wenstrom testified that he

also learned that N.P. may have owed someone money for drugs.

According to Det. Wenstrom, another witness, referred to herein as S.M., contacted the

police in late March.[5]  S.M. lived in the area of the shooting and she knew the victim—N.P.

S.M. initially contacted the police via telephone, and she spoke with a detective named Leopold.

The call occurred during the evening, and Det. Leopold was not involved in the N.P. murder

investigation.  During that call, S.M. advised that Hurley was known to be armed with a "John

Wayne" revolver.  S.M. also described Hurley as yelling, but she did not advise Det. Leopold

that she saw Hurley with a gun on the date of the shooting.

Detective Wenstrom testified that he wanted to conduct a more "extensive" interview, so

on April 4, 2019, he interviewed S.M. in person.  (Tr. Vol. I at 31)  S.M. advised Det. Wenstrom

that, on the morning of January 19, 2019, S.M. saw N.P. run directly by, and she also observed a

group of people gathered down the street at the intersection of Marcus and Carter (see Gov't

Exh. J), including the owner of a store at Marcus and Carter who was in the street waiving a gun

yelling, "That's what he gets."  (Tr. Vol. I at 8)  S.M. identified the owner as "Lisa."  S.M.

reported that Lisa was known to be aggressive.  This witness identified Lisa Hurley from a

photospread.  (Id. at 11)

Detective Wenstrom testified that, on April 24, 2019, he issued a "Wanted"[6] for Hurley's

arrest relative to the death of N.P.  Det. Wenstrom explained that he based the request on

information from E.S., A.B., and S.M., and that Hurley was associated with the corner store

---

[5] Det. Wenstrom testified that E.S. referred to S.M. as her cousin and that E.S. mentioned S.M. earlier.

[6] Detective Wilcox explained that a Wanted to arrest a person may be issued by a police officer based on probable cause or reasonable suspicion.  (See Tr. Vol. I at 67)  In contrast, according to Det. Wilcox's testimony, a warrant is issued by a judge.  (Id.)

based on police burglary reports in which Hurley represented that she owned the store.

Detective Wenstrom testified that he believed he had probable cause to support the wanted, and he also wanted to hear Hurley's side of the story.  Det. Wenstrom testified that, during his investigation concerning N.P.'s murder, he did not "discover anything that would lead [him] to believe that [the witnesses had] collaborated to lie" about Hurley's involvement.  (Tr. Vol. I at 32)

Detective Wenstrom requested the assistance of Det. Wilcox in locating and arresting Hurley.  In so doing, Det. Wenstrom shared facts and circumstances regarding the investigation. These included that investigators had been advised that Hurley was known to possess a revolver described as a "John Wayne gun."  (Id. at 13)

James Wilcox is a detective with the SLMPD with about twelve years of experience as of the evidentiary hearing.  In May 2019, Det. Wilcox was assigned to the Fugitive Apprehension Strike Team ("FAST") within the Intelligence Unit.  His team assists in locating and apprehending fugitives and persons wanted for felonies.

Regarding Hurley, Det. Wilcox testified that he verified that there was a "Wanted" in the system, and he also looked into information relative to officer safety concerns.  Det. Wilcox identified Hurley's residence at 4825 Bessie.  Det. Wilcox surveilled the residence area.  On May 8, 2019, while surveilling 4825 Bessie, Det. Wilcox observed Hurley carrying a red and white bookbag from her house to a car.  He testified that the bag was slung over her shoulder.  Det. Wilcox observed Hurley exit the residence and he followed her as she drove to her store at Marcus and Carter.  At the store, he observed her unlock the store and take bags in, including the red and white bookbag.  Det. Wilcox waited at the store for more officers to arrive as it was his intention to arrest Hurley on the Wanted.

The store was small, with a customer area and an employee area separated by glass.  (See Gov't Exhs. B, K)  When Det. Wilcox walked into the store on May 8th, there were two people in the customer area.  Det. Wilcox entered the store with other officers, including Det. Nijauh Woodard.  As noted above, Woodard is currently a Deputy U.S. Marshal.  At the time of the events in question, he was an SLMPD Detective with about nine years of experience.  Det. Woodard was also an FBI Task Force Officer and worked in fugitive apprehension.  Det. Woodard was not involved in the underlying homicide investigation of Hurley, but he attended a briefing and knew Hurley had a violent history and was a convicted felon.

Detective Wilcox was wearing a vest that said "Police."  He testified that he announced the police officers' presence and that his purpose was to arrest Hurley.  Det. Wilcox explained that, when he entered, he could see Hurley on the other side of the glass partition.  Det. Wilcox testified that, as he was announcing his presence, Hurley's hands went beneath the counter.  As a result, he drew his firearm and Det. Woodard went through a door marked employees only and entered the area behind the glass where they had observed Hurley.  Det. Wilcox testified that he believed that Hurley was attempting to arm herself and he was concerned for his safety, and he advised the other officers that she might be reaching for a gun.  Upon command from Det. Wilcox, Hurley raised her hands.  Det. Wilcox testified that he would have asked Hurley to come out but for her moving her hands beneath the counter.  He also testified that he intended to take her into custody based on the Wanted.

Detective Woodard conducted a brief sweep of the back area of the store and, in that process, he observed the red and white book bag discussed above.  Det. Woodard testified that he was looking for people during the search, but the bag was open, and he could see handguns inside the bag.  Det. Woodard advised Det. Wilcox what he saw.  Det. Wilcox was aware that

Hurley had a prior felony conviction and placed her under arrest for possession of the guns found in the bag.

Detective Wilcox testified that, even though he observed Hurley open the store, it was a routine practice to conduct a safety sweep in the circumstances to make sure nobody else was present who might cause harm.  No gun was observed under the counter where Det. Wilcox observed Hurley move her hands as he walked in.

Simultaneously with Det. Woodard's sweep, Det. Wilcox arrested Hurley.[7]  During this time, Hurley requested medication from her red and white bag.  Det. Woodard testified that he was aware of the request, that he seized the firearms, and that Hurley was given her medication.  (See Gov't Exhs. C, D, E)

Detective Wenstrom testified that, after Hurley's arrest, he spoke with her about the homicide and that she was wearing a neck brace at the time.  (Gov't Exh. A)  This is consistent with her request for medication.  Det. Wenstrom also testified that Hurley advised him that her business had been burglarized and that she had obtained some guns for protection, but she denied firing the guns.[8]

On June 24, 2019, as a result of the firearms seized on May 8th, Det. Wilcox applied for and received a warrant to arrest Hurley.  (Def. Exh. A)  On June 25, 2019, Det. Wilcox and other officers went to Hurley's residence at 4824 Bessie to execute the arrest warrant.  During the morning hours, the officers knocked on the door and Hurley answered the door while dressed in pajamas.  Hurley asked for clothing and officers entered the house, conducted a brief safety sweep, and assisted her in finding appropriate clothing.  Det. Wilcox explained it was policy that

---

[7] Det. Wilcox testified that Hurley's arrest and Det. Woodard's safety sweep occurred simultaneously.

[8] There was no motion to suppress Hurley's statements.  Accordingly, there is no discussion regarding Miranda warnings.

Hurly be properly dressed before being conveyed to the Justice Center.  Det. Wilcox further explained that, for safety reasons and because Hurley was known to be armed, officers needed to go into the house with her to get clothing.  Det. Wilcox testified that the officers would not have retrieved any clothing for Hurley without first conducting a safety sweep.  During the sweep, officers observed and seized a shotgun from a back room, and suspected narcotics.

Additional findings of fact are included in the discussion below.

## DISCUSSION, CONCLUSIONS OF LAW, AND RECOMMENDATIONS

### I.   May 8, 2019, Arrest and Seizure of Evidence

Detective Wilcox and the officers with him entered Hurley's business on May 8, 2019, intending to arrest Hurley.  It is not disputed that the officers did not have an arrest warrant or a search warrant.  Hurley argues that the police lacked probable cause to arrest her for any crime when they entered her store.  She further argues that she had a reasonable expectation of privacy in the area of her store where officers entered and seized firearms from the red and white bag.

The government contends that the officers had sufficient probable cause to conduct a warrantless arrest of Hurley for the murder of N.P., as well as for unlawful use of a weapon.  The government also argues that the officers did not violate the Fourth Amendment by entering the employees only work area during the course of the May 8th encounter with Hurley because a protective sweep of that area was lawful in the circumstances.

### A.   Basis of Arrest on May 8, 2019

It is not disputed that a "Wanted" is not a substitute for a court-issued arrest warrant.[9]  It

---

[9] Our Court has previously explained that "wanteds are a type of warrantless arrest, and therefore permissible only if the wanted is based on probable cause."  Furlow v. Belmar et al., 4:16 CV 254 HEA, 2019 WL 1227460 at *1 (Mar. 15, 2019).  The Eighth Circuit has also explained that wanteds issued on the basis of reasonable suspicion that a person has committed an offense may justify "'a stop to check identification, to pose questions to the person, or to detain the person briefly while attempting to obtain further information.'"  United States v. Smith, 648 F.3d 654, 659 (8th Cir. 2011) (quoting United States v. Hensley, 469 U.S. 221, 232 (1985)).

is also not disputed that Hurley was arrested.  The undersigned finds, therefore, that the police conducted a warrantless arrest of Hurley on May 8, 2019.

"A warrantless arrest by law enforcement is reasonable where there is probable cause to believe that someone has committed or is committing a crime."  United States v. Winarske, 715 F.3d 1063, 1066 (8th Cir. 2013).  "Probable cause for an arrest exists if, at the moment the arrest was made, the facts and circumstances within the officers' knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent person in believing that an offense has been committed."  United States v. Rivera, 370 F.3d 730, 733 (8th Cir. 2004) (citation omitted).  Probable cause is evaluated based "on the facts as they would have appeared to a reasonable person in the position of the arresting officer."  Id.  "In making this determination, '[l]aw enforcement officers have substantial latitude in interpreting and drawing inferences from factual circumstances.'"  United States v. Webster, 625 F.3d 439, 442 (8th Cir. 2010) (quoting United States v. Henderson, 613 F.3d 1177, 1181 (8th Cir. 2010)).  "'Because probable cause requires only a probability or substantial chance of criminal activity, rather than an actual showing of criminal activity, the police need not have amassed enough evidence to justify a conviction prior to making a warrantless arrest.'"  Id. (quoting United States v. Mendoza, 421 F.3d 663, 667 (8th Cir. 2005)).[10]

Under the "collective knowledge rule," in making a warrantless arrest, an officer may rely on information provided to the team of officers involved, so long as "there is some degree of communication."  United States v. Shackleford, 830 F.3d 751, 753-54 (8th Cir. 2016) (internal

---

[10] See also United States v. Brooks, 982 F.3d 1177, 1180 (8th Cir. 2020) ("Probable cause … does not require officers to establish the elements of the offense with a [trial] level of certainty …."); United States v. Perry, 908 F.3d 1126, 1129 (8th Cir. 2018) ("Probable cause 'requires only a probability or substantial chance of criminal activity, not an actual showing of such activity'; it 'is not a high bar.'") (quoting District of Columbia v. Wesby, 138 S. Ct. 577, 586 (2018)), cert. denied, 140 S. Ct. 90 (2019).

quotations and citation omitted); see also United States v. Poe, 462 F.3d 997, 1001 (8th Cir. 2006) (explaining that the collective knowledge rule extends to officers on the scene who are working as a team).

Based on the foregoing legal principles, the undersigned finds that Det. Wenstrom had probable cause to arrest Hurley on May 8, 2019, and that there were sufficient communications between the homicide investigators and Det. Wilcox that the collective knowledge rule applies.

N.P. was shot in the area of Carter and Marcus, in the City of St. Louis, on January 15, 2019.  It is not disputed that N.P. was transported to Barnes-Jewish Hospital by E.S. and A.B. N.P. died as a result of his wound.  Det. Wenstrom testified that E.S. and A.B. reported that they picked up N.P. after hearing he had been shot and they drove him to the hospital.  Det. Wenstrom credibly testified that E.S. and A.B. told Det. Wenstrom that N.P. stated, in substance, that the "bitch at the store" had shot him.

Detective Wenstrom also spoke with S.M., who contacted the police in late March 2019, which was after Det. Wenstrom interviewed Telvon Boyd (a/k/a "Monk").  S.M. lives near Marcus and Carter and reported that she had information.  S.M. initially spoke to a detective on duty who did not have knowledge of the N.P. murder investigation.  Det. Wenstrom arranged to personally interview S.M. on April 4, 2019.  Det. Wenstrom testified that S.M. reported to him that, on the morning of the shooting, S.M. observed N.P. run by her home as she was unloading groceries.  S.M. reported that she observed a group of people gathered near the intersection of Marcus and Carter, and that she observed the owner of the store in the street waiving a gun and yelling, "that's what he gets."  S.M. identified Hurley from a photospread as the store owner she observed.  S.M. further represented that the store owner was known to be aggressive, and that she was known to have a "John Wayne" revolver.

Furthermore, a hospital security guard advised officers that, when N.P. arrived at the hospital, N.P. stated that "they" shot him.  Such a statement was generally consistent with S.M.'s statement to Det. Wenstrom that she saw multiple people in front of the store, including Hurley.

While it is true that E.S. was not initially forthcoming with Det. Wenstrom, Det. Wenstrom followed up with E.S. and A.B.; he did not simply accept their information as provided.  Further, while defense counsel implied through questioning that the reporting witnesses were related, in cahoots, and had a motive to frame Hurley, Det. Wenstrom credibly testified that he did not know that these witnesses were, in fact, related and suspected that they were not.  Furthermore, Det. Wenstrom interviewed Telvon Boyd (a/k/a Monk) before he interviewed S.M. and before he issued the Wanted for Hurley.  Det. Wenstrom testified that, during his investigation, he did not "discover anything that would lead [him] to believe that [the witnesses had] collaborated to lie" about Hurley.  (Tr. Vol. I at 32)  The undersigned credits Det. Wenstrom's testimony in this regard.

The Court's focus is on what the officers knew at the time of the arrest and not additional facts that could have undermined probable cause, or whether the police had sufficient evidence to convict Hurley.  There is nothing before the Court to suggest that Det. Wenstrom ignored plainly exculpatory evidence.  See United States v. Evans, 851 F.3d 830, 835 (8th Cir. 2017).  To the contrary, the record indicates that the police conducted a "reasonably thorough investigation prior to arresting [Hurley]," and there is nothing to indicate that "'minimal further investigation' would have exonerated [her]."  Id. (citations omitted).

Three witnesses identified Hurley, directly or circumstantially, as the person who shot N.P.  E.S. and A.B. provided the initial information.  Det. Wenstrom conducted further investigation, including interviewing a separate witness—S.M.—who provided information

tending to corroborate the information from E.S. and A.B.  The information from S.M. was consistent with information from a hospital security guard.  Det. Wenstrom also checked police reports, confirming Hurley's association with the store.  Cf. United States v. Mays, 993 F.3d 607, 2021 WL 1257811 at *1 (8th Cir. Apr. 6, 2021) (in search and seizure context, discussing informant credibility and explaining that information from known informants may be more reliable because they may be held accountable for fabrications and that the corroboration of even innocent details can support a finding of probable cause).

In summary, the undersigned finds that the facts available to the police[11] on May 8, 2019, while certainly not overwhelming, provided probable cause to support the warrantless arrest of Hurley.  See Perry, 908 F.3d at 1129 (explaining that probable cause does not require an actual showing of criminal activity and is "not a high bar").

### B.     Seizure of Evidence on May 8, 2019

The fact that the police could lawfully arrest Hurley on May 8th does not necessarily answer the question of whether they lawfully seized the firearms from the red and white bag.

"To assert a Fourth Amendment right to be free from unreasonable searches, [Hurley] 'must demonstrate that [s]he personally has an expectation of privacy in the place searched, and that [her] expectation is reasonable.'"  United States v. Lewis, 864 F.3d 937, 941 (8th Cir. 2017) (quoting United States v. Russell, 847 F.3d 616, 618 (8th Cir. 2017)).  The May 8, 2019, search at issue herein occurred inside Hurley's business.  "An individual can have a reasonable expectation of privacy in commercial premises, although that expectation 'is different from, and indeed less than, a similar expectation in an individual's home.'"  Id. (quoting New York v.

---

[11] These facts include the facts known to Det. Wenstrom, which are attributable to Det. Wilcox via the collective knowledge rule because there was ample evidence of communications between officers involved in this matter.

Burger, 482 U.S. 691, 7000 (1987)).

In Lewis, the Eighth Circuit examined the distinction between those portions of a business that the public and law enforcement may enter, and those that remain private.  See id. at 941-42.  Lewis involved a tattoo parlor in which employees would reasonably expect members of the public to enter the work area, even though that area was beyond a reception desk and bell because, among other facts, customers entered the work area for tattooing.  See id. at 942-43.

By contrast, the facts of the instant case demonstrate that the guns seized on May 8, 2019, were seized from a private area in which Hurley would not reasonably expect members of the public or others to routinely enter.  Her store was small.  There was a glass partition that separated the customer area from her work area.  (Gov't Exh. B)  Access to her work area was further restricted by a door that was marked "Employees ONLY."  (Gov't Exhs. B, C)  The guns were seized from a red and white St. Louis Cardinals bookbag/backpack that was placed on a bin, in the employees only area, adjacent to another room that does not appear to be open to the public.  The bin appears to be about 12-15 inches in height (Gov't Exhs. C, D), placing the bag below the counter height of the store.  There was no testimony that any officer observed the contents of the bag before entering the employees only area of the store.  On the other hand, most of the employees only area of the store was, in fact, visible through the glass partition.

It is not necessary in this case to conclusively decide whether Hurley enjoyed a reasonable expectation of privacy in the employees only area of her store.  Because even if she did have an expectation of privacy, exigent circumstances justified the officers' warrantless entry into that space.[12]

---

[12] Although an arrest warrant carries with it the authority to enter a protected space, even a home, when there is reason to believe the suspect is inside, see Payton v. New York, 445 U.S. 573, 603 (1980); United States v. Bennett, 972 F.3d 966 (8th Cir. 2020), a similar authority does not extend to warrantless arrests.

The Eighth Circuit has explained that, "[a] legitimate concern for officer safety or the safety of others may constitute an exigent circumstance, and a warrantless entry into [an otherwise constitutionally protected space] may be justified if an officer has a reasonable fear of harm." Poe, 462 at 1000 (citing United States v. Hill, 430 F.3d 939, 941 (8th Cir. 2005)).  Det. Wilcox credibly testified that he clearly identified himself as a police officer when he entered the store.  He further credibly testified that, as he entered, he observed Hurley place her hands below the counter.  At that point, based on all of the facts and circumstances,[13] the officers present had reasonable suspicion that Hurley may be armed or attempting to arm herself.

Hurley suggests that Det. Wilcox testimony is not credible, noting that the first time Det. Wilcox mentioned any furtive movements by Hurley was during cross-examination at the first evidentiary hearing.  Here is the relevant exchange between Hurley's attorney and Det. Wilcox:

> Q.      Officer, what did you state to Ms. Hurley when you entered the [store]?
>
> …
>
> A.      At the store I advised her that she is Wanted in connection with a homicide investigation relative to a Murder First investigation.
>
> Q.      Did you have your weapon drawn at that time?
>
> A.      Not when I advised her of that particular circumstance.  When I was walking in the store advising her … when I approached her and she started to reach under the counter that's when I drew my weapon.

(Tr. Vol. 1 at 62-63)  As the following exchange indicates, Det. Wilcox testified consistently during direct examination when the Court re-opened the evidentiary hearing on February 5, 2021:

> Q.      What happened when you – after you got in the front door [of the store]?

---

[13] SLMPD officers knew, for example, that Hurley was a convicted felon, reportedly kept a "John Wayne" gun, and that she was wanted for murder.  The officers also knew that there were other people in the store.

A.      As I was approaching, advising [Hurley] of my investigation, she immediately – her hands immediately disappeared underneath the counter … that's when I drew my firearm.

(Tr. Vol. III at 7-8)  Det. Wilcox explained that, after he drew his weapon, the other officers entered the employees only portion of the store.  (See id.)

Having reviewed the entire record in this matter and having had the opportunity to observe Det. Wilcox's demeanor twice, the undersigned finds his testimony to be credible.[14] The undersigned finds, therefore, the officers had legitimate concerns for officer and public safety and could lawfully enter the employees only area to complete the arrest process.

Upon entering the employees only area to arrest Hurley, the officers present could also conduct a brief, protective sweep of the area.  "'A protective sweep is a quick and limited search of premises, incident to an arrest and conducted to protect the safety of police officers or others. It is narrowly confined to a cursory visual inspection of those places in which a person might be hiding.'"  United States v. Anderson, 688 F.3d 339, 346 (8th Cir. 2012) (quoting Maryland v. Buie, 494 U.S. 325, 327 (1990)).  The Eighth Circuit has explained that, pursuant to Buie, "incident to an arrest, officers may, as a precaution and without any requisite level of suspicion, look in closets and other spaces immediately adjoining the place of arrest from which an attack could be immediately launched."  United States v. Davis, 471 F.3d 938, 944 (8th Cir. 2004) (citation and internal quotations omitted).

"During a properly limited protective sweep, the police may seize an item that is in plain

---

[14] Hurley also contends that Det. Woodard's testimony contradicts Det. Wilcox's testimony regarding the details of the arrest and entry into the employees only area of the store.  The undersigned disagrees with this characterization.  While their testimony is not entirely identical, it is consistent in material respects.  More importantly, Det. Wilcox was clear that the events that occurred after he drew his weapon occurred nearly simultaneously.  (See Tr. Vol. I at 64)  The undersigned finds that no officer entered the back area of the store until after Hurley placed her hands under the counter.

view if its incriminating character is immediately apparent….”  United States v. Williams, 951 F.3d 892, 896 (8th Cir. 2020) (citation and internal quotations omitted); see also Poe, 462 F.3d at 1001 (“Under the plain view doctrine, an officer may seize an object without a warrant if the officer did not violate the Fourth Amendment to arrive at the place from which the object was in plain view, the object's incriminating character was immediately apparent and the officer had a lawful right of access to the object.”) (citation omitted).

Detective Wilcox explained that, after Hurley placed her hands below the counter, the events that followed occurred nearly simultaneously.  One of those events was a protective or safety sweep of the employees only area of the store.  Det. Woodard testified that he conducted a brief safety sweep of the back area of the store.  The record makes clear that he conducted his sweep for safety purposes, not to locate any evidence or contraband.  The sweep was cursory and limited solely to the space immediately adjoining the place of arrest.  Thus, the protective sweep was constitutionally sound.

Furthermore, based on Det. Woodard's testimony and Government's Exhibits C and D, the undersigned finds that the two firearms seized from Hurley's red and white bag were lawfully seized under the plain view doctrine.  Based on the analysis above, the undersigned finds that the police officers were lawfully present in the back room of the store and Det. Woodard could plainly view the handguns in the bag.  The officers knew Hurley was a convicted felon who could not possess firearms, so the incriminating character would have been immediately apparent.  Accordingly, the officers lawfully seized the firearms from the red and white bag.

In addition to the protective sweep, the record establishes that, contemporaneously with her arrest, Hurley asked the police for her medication.  The medication was in the red and white

bag with the guns.  (See Gov't Exh. E)  Therefore, the guns were also in plain view as the officers retrieved Hurley's medication at her request.

### C.   Summary – May 8, 2019 Arrest and Seizure of Evidence

The undersigned finds that Det. Wenstrom had minimal but sufficient probable cause to arrest Hurley for her involvement in the shooting and death of N.P.  Det. Wilcox and the arrest team were briefed on important aspects of Det. Wenstrom's investigation.  Therefore, pursuant to the collective knowledge rule, Det. Wilcox had probable cause to conduct a warrantless arrest of Hurley.  Further, regardless of whether Hurley had a reasonable expectation of privacy in the employees only area of her small business, due to legitimate safety concerns, Det. Wilcox and other officers present did not violate the Fourth Amendment by entering the employees only area to complete the arrest.  Likewise, Det. Woodard did not violate the Fourth Amendment by conducting a protective sweep of the employees only area, and he lawfully observed and seized the two pistols from Hurley's bag pursuant the plain view doctrine.

Accordingly, the undersigned respectfully recommends that the Court deny Hurley's motion to suppress evidence seized on May 8, 2019.

## II.   June 25, 2019, Arrest and Seizure of Evidence

On June 24, 2019, Det. Wilcox applied for and received a warrant to arrest Hurley based on the guns seized on May 8th.  On June 25, 2019, Det. Wilcox and others executed that warrant at Hurley's home, which was located at 4824 Bessie, in St. Louis, MO.  In connection with the arrest, officers conducted a protective sweep of the residence and located a shotgun in a back room, as well as suspected Xanax and marijuana.  (See Def. Exh. D)

Hurley argues that the sweep of her residence on June 25, 2019, was unlawful and that that the arrest warrant was tainted and constitutes fruit of the poisonous tree.  The government

contends that the firearms were seized in plain view during a lawful safety sweep of Hurley's residence.

A. **Did the May 8, 2019, Arrest Taint the Subsequent Arrest Warrant and Seizure?**

Based on the analysis above regarding the May 8, 2019, arrest and gun seizures, the undersigned rejects Hurley's contention that her June 25, 2019, arrest was tainted and constitutes the fruit of the poisonous tree.  In the alternative, the undersigned also finds that, pursuant to the attenuation doctrine, the evidence seized on June 25th need not be suppressed due to any perceived constitutional deficiencies regarding Hurley's arrest on May 8th.

Under the attenuation doctrine, "[e]vidence is admissible when the connection between unconstitutional police conduct and the evidence is remote or has been interrupted by some intervening circumstance, so that 'the interest protected by the constitutional guarantee that has been violated would not be served by suppression of the evidence obtained.'"  Utah v. Strieff, 136 S. Ct. 2056, 2061 (2016) (quoting Hudson v. Michigan, 547 U.S. 586, 593 (2006)).  "The attenuation doctrine evaluates the causal link between the government's unlawful act and the discovery of evidence, which often has nothing to do with a defendant's actions."  Id.

The Supreme Court has identified three factors in applying the attenuation doctrine. "First, [reviewing courts] look to the 'temporal proximity' between the unconstitutional conduct and the discovery of evidence to determine how closely the discovery of evidence followed the unconstitutional search."  Id. at 2062 (quoting Brown v. Illinois, 422 U.S. 590, 603 (1975)). Thus, shorter time periods between events may tend to favor suppression.  Id.  "Second, [courts] consider 'the presence of intervening circumstances.'"  Id. (quoting Brown, 422 U.S. at 603-04). "Third, and 'particularly' significant we examine 'the purpose and flagrancy of the official misconduct.'"  Id. (quoting Brown, 422 U.S. at 604).

Applying these three factors, the undersigned finds that, even if the police lacked probable cause to arrest Hurley on May 8, 2019, the evidence seized on June 25, 2019, need not be suppressed because any taint was attenuated.  First, more than a month passed between events, and the firearm seized on June 25, 2019, was distinct in terms of type and location seized.  Second, the fact that the police applied for and received an arrest warrant serves as a significant intervening circumstance.  The warrant was issued by a State Court judicial officer.  And importantly, the police did not capitalize on the May 8th events for the purpose of seizing more firearms.  Rather, they simply applied for an arrest warrant.  The fact that they discovered yet another firearm was, effectively, a coincidence.  Third, the original misconduct (if there was any at all) was not flagrant.  In fact, as noted above, the undersigned believes that there was no police misconduct.  Therefore, the attenuation doctrine should be applied if the Court finds that the police lacked probable cause to arrest Hurley on May 8, 2019.

### B.      Arrest and Protective Sweep on June 25, 2019

As noted above, pursuant to an arrest, police officers can conduct a protective or safety sweep of the areas and spaces adjacent to the place of arrest.  See Davis, 471 F.3d at 944; see also United States v. Waldner, 425 F.3d 514, 517 (8th Cir. 2005) (explaining that "Buie authorizes protective sweeps for unknown individuals in a house who may pose a threat to officers as the effectuate an arrest); United States v. Alatorre, 863 F.3d 810, 813 (8th Cir. 2017) (quoting Waldner).

In this case, Det. Wilcox arrested Hurley during the early morning hours of June 25th "right inside [the] front door of her residence."  (Tr. Vol. I at 49)  That circumstance arguably justified a safety sweep of the home.  The Eighth Circuit has "summarized that [a] protective sweep is justified by the threat of accomplices launching a surprise attack during an arrest and is

19

particularly important during an in-home arrest, due to the heightened potential for an ambush in

unfamiliar surroundings." Alatorre, 863 F.3d at 814 (internal quotations and citations omitted);

see also Davis, 471 F.3d at 944.  It makes no difference whether the officers conducted the

sweep after Hurley had been secured.  See United States v. Whitehead, -- F.3d --, slip op. at 3,

2021 WL 1603810 at *2 (8th Cir. Apr. 26, 2021) (per curiam) (citing Alatorre, 863 F.3d at 812-

14).

   But the fact that Hurley was arrested just inside her home is not the only circumstance

that would support a sweep in this case.  At the time of her arrest, Hurley was wearing pajamas.

Det. Wilcox testified that, per department policy, Hurley needed proper shoes and clothing

before she could be transported to the City of St. Louis Justice Center.  Hurley was allowed to

get clothing, but only after officers conducted a safety sweep.  Det. Wilcox explained that it

would be dangerous for the officers to go into such a situation with a person like Hurley without

first conducting a sweep.  And there is no information suggesting that the sweep was extensive

or conducted for any purpose other than safety.[15]  Based on the record before the Court,

therefore, the undersigned finds that the sweep was proper under Buie and relevant Eighth

Circuit precedent and did not violate the Fourth Amendment.

   Detective Wilcox also testified that, during the sweep, officers observed suspected drugs

and a shotgun in plain view.  (See also Gov't Exhs. G-I)  Therefore, those items need not be

suppressed even though they were seized from Hurley's residence without a search warrant.  See

Williams, 951 F.3d at 896 (discussing plain view seizure in the context of a protective sweep).

### C.   Conclusion – June 25, 2019, Arrest and Seizure

   For the foregoing reasons, the undersigned recommends that the Court deny Hurley's

---

[15] Detective Wilcox also explained that a safety sweep was also conducted to ensure that there were no children, or ill and bedridden people in the house that need attention or care.  (Tr. Vol. I at 49)

motion to suppress evidence seized from her residence on June 26, 2019.

### RECOMMENDATION

Accordingly,

**IT IS HEREBY RECOMMENDED** that Defendant Lisa Hurley's Motion to Suppress Evidence [ECF No. 46] be DENIED.

The parties are advised that they have fourteen (14) days in which to file written objections to the foregoing Report and Recommendation unless an extension of time for good cause is obtained, and that failure to file timely objections may result in a waiver of the right to appeal questions of fact.  See Thompson v. Nix, 897 F.2d 356 (8th Cir. 1990).  see also 28 U.S.C. § 636(b)(1)(A), Fed. R. Crim. P. 59(a).

This matter will be set by further order of the Court, before the Honorable Stephen R. Clark, United States District Judge.

/s/ *John M. Bodenhausen*
JOHN M. BODENHAUSEN
UNITED STATES MAGISTRATE JUDGE

Dated this  28th   day of April, 2021.